# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JOAN MARIE PIERCE,

Plaintiff,

v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,[1]

Defendant.

No. 16 C 3968

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Joan Marie Pierce filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and filed cross motions for summary judgment. For the reasons stated below, the case is affirmed.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act.[2] *York v. Massanari*, 155 F.

---

[1] Nancy A. Berryhill, who became Acting Commissioner of Social Security on January 23, 2017, is substituted for her predecessor as the proper defendant in this action. Fed. R. Civ. P. 25(d).

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th

Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he or she is unable to per-form "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activi-ties and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impair-ments enumerated in the regulations?
4. Is the claimant unable to perform her or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disa-bled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Ac-cordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on September 12, 2012, alleging that she became disabled on January 18, 2012, due to neck, left shoulder and back conditions, cervical fusion, high blood pressure, depression, and anxiety. (R. at 259–60, 292). The application was denied initially and upon reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id*. at 83–104, 121). On May 8, 2014, Plaintiff, represented by counsel, presented at a hearing before an Administrative Law Judge (ALJ). (*Id*. at 78–82). In light of medical records which became available shortly before Plaintiff's hearing, Plaintiff's counsel and the ALJ agreed to postpone the hearing until a later date. (*Id*. at 80–82). Another hearing was held on August 8, 2014, where Plaintiff, represented by counsel, testified before the ALJ. (*Id*. at 29–77). The ALJ also heard testimony from Ashley Hinton, Plaintiff's daughter, ChukwuEmeka Frank Ezike, M.D., a medical expert (ME), and Pamela Jean Tucker, a vocational expert (VE). (*Id*. at 29–77, 248–50).

The ALJ denied Plaintiff's request for benefits on October 27, 2014. (R. at 9–28). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since her alleged onset date of January 18, 2012. (*Id*.). At step two, the ALJ found that Plaintiff's degenerative disc disease, status post fusion surgery, obesity, diabetes mellitus, and left shoulder tendinosis are severe impairments. (*Id*. at 14–15). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impair-

ments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 16).

The ALJ then assessed Plaintiff's Residual Functional Capacity (RFC)[3] and determined that Plaintiff has the RFC to perform sedentary work, except

> she can occasionally climb ramps and stairs, but never ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch and crawl; occasionally reach in all directions, including overhead with the left upper extremity; frequently handle, finger and feel with the left upper extremity. She can have no exposure to or work around extreme cold and heat, wetness, hazards such as moving machinery or unprotected heights; [s]he can perform unskilled work tasks that can be learned by demonstration in 30 days or less of a simple, routine, and repetitive in nature; that involve occasional decision making; occasional changes in the work setting and no strict production quota or fast pace, but can meet production goals with occasional contact with the general public of an incidental and superficial nature. She is limited to occasional interaction with supervisors and co-workers.

(R. at 16). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff cannot perform any past relevant work. (*Id.* at 21). At step five, based on Plaintiff's RFC, her vocational factors, and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including circuit board assembler, address clerk, and document preparer. (*Id.* at 22). Accordingly, the ALJ concluded that Plaintiff is not under a disability, as defined by the Act. (*Id.* at 23).

The Appeals Council denied Plaintiff's request for review on February 18, 2016. (R. at 1–6). Plaintiff now seeks judicial review of the ALJ's decision, which stands as

---

[3] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Act. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

Plaintiff completed high school and two years of college courses, and most recently worked full-time as a shipping clerk. (R. at 293). In February 2011, Plaintiff was injured on the job when she tripped over an electronic power jack and fell on her left side, hitting her head. (*Id.* at 659). Plaintiff presented to St. James Hospital and Health Center one week after her accident, where a CT scan of her cervical spine revealed that she had a minimal disc bulge at C5-6 and C6-7. (*Id.* at 659–60).

Beginning in February 2011, Plaintiff began to routinely present to William Payne, M.D., for radiating neck, head, and left-side pain, which was accompanied by numbness and tingling. (R. at 638, 676–700). In October 2011, Dr. Payne ordered an MRI of Plaintiff's spine which revealed that she suffered from C5-6 cervical steno-

sis[4] and foraminal herniation, which he treated with epidural injections, physical therapy, and Norco. (*Id.* at. 387–406, 640–42). At several of her appointments, Dr. Payne expressed concerns over proceeding with surgery due to Plaintiff's weight, which hovered around 290 pounds.[5] (*Id.* at 397, 399, 401, 403). In May 2012, when Plaintiff's weight was recorded as 276 pounds, Dr. Payne scheduled her for an anterior cervical discectomy[6] and fusion, which was performed on June 18, 2012. (*Id.* at 397; 649). Following her surgery, Plaintiff reported the procedure had "definitely helped with her pain" and that her symptoms were less severe. (*Id.* at 392). In August 2012, an MRI of Plaintiff's thoracic spine revealed that she had a T7-8 disk bulge, which Dr. Payne successfully treated with epidural injections and medication.[7] (*Id.* at 388). Plaintiff requested to be released from Dr. Payne's care in October 2012. (*Id.* at 387).

On November 26, 2012, state agency consultant Reynaldo Gotanco, M.D., performed a Physical RFC Assessment based on his review of Plaintiff's medical records. (R. at 88–89). Dr. Gotanco opined that Plaintiff could perform work at a light

---

[4] Stenosis is the "abnormal narrowing of a duct or canal." *Dorland's Medical Dictionary*, available at http://www.dorlands.com (last visited May 10, 2017). [hereinafter *Dorland's*].

[5] On the same date, Plaintiff's height was recorded as 5′3″, resulting in a Body Mass Index of 51.5. (R. at 403). An individual's BMI is "a measure of body fat that gives an indication of nutritional status." *Dorland's*. The World Health Organization classifies any BMI greater than 40 as "obese class III." World Health Organization http://apps.who.int/bmi/index.jsp?introPage=intro_3.html (last visited May 10, 2017).

[6] A discectomy, also called a diskectomy, is an "excision of an intervertebral disk." *Dorland's*.

[7] In his treatment record dated August 30, 2012, Dr. Payne stated that "an MRI of [Plaintiff's] thoracic spine show[ed] a . . . T7-T8 disk bulge." (R. at 388). However, Plaintiff's record dated August 8, 2012 revealed that she had a "[n]ormal MRI of the thoracic spine." (*Id.* at 413).

exertional level, limited to occasionally lift 20 pounds; frequently lift 10 pounds; stand, walk, and sit about six hours in an eight-hour workday, and frequently stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds. (*Id.* at 88–91). On April 4, 2013, after review of the available medical evidence, Charles Wabner, M.D., reached the same conclusion. (*Id.* at 100–01).

On November 28, 2012, state agency consultant Richard Hamersma, Ph.D., performed a psychiatric assessment of Plaintiff's medical records and concluded that she had no restriction of activities of daily living, no difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, no repeated episodes of decompensation, and overall, that she had no severe mental impairments. (R. at 86–87). On April 2, 2103, Leon Jackson, Ph.D., reviewed Plaintiff's medical record and reached an identical result. (*Id.* at 98–99).

In January 2013, Plaintiff presented to William Giricz, D.O., where he assessed her with diabetes, hypertension, depression/anxiety, and thoracic disc disease. (R. at 607). Despite her ongoing conditions, Plaintiff expressed that she did not wish to continue using narcotic medication to treat her pain in order to "avoid the potential applications with regards to liver disease." (*Id.*). Plaintiff felt that "she [was] able to cope with [her] pain by . . . other methods, even though [it was] severe at times." (*Id.*). At the same examination, Dr. Giricz noted that Plaintiff's blood sugar levels were "worse than usual" due to Plaintiff's poor compliance with her diet over the holidays. (*Id.*). Three months later, Plaintiff weighed 275 pounds, resulting in a

BMI of 53.71.[8] (*Id.* at 615). On May 16, 2013, Dr. Giricz completed a Physical Capacities Evaluation where he opined that Plaintiff's pain from her cervical disc disease and her status post surgery would be severe enough to prevent her from working full-time, even at a sedentary exertional level. (*Id.* at 613). Additionally, he indicated that Plaintiff's pain and the side effects of her medications would eliminate her ability to perform skilled work tasks. (*Id.* at 614).

On June 5th, 2013, Dr. Payne completed a Physical Capacities Evaluation, similar to Dr. Giricz's. (R. at 622–25). However, in his evaluation, Dr. Payne opined that Plaintiff could occasionally lift up to five pounds and never climb, balance, stoop, kneel, crouch, crawl, or reach above shoulder level. (*Id.* at 622–23). Furthermore, he concluded that Plaintiff's pain and the side effects of her medication would only slightly interfere with tasks requiring sustained attention and concentration. (*Id.* at 625).

In addition to the foregoing evidence, Plaintiff's record contains an undated letter from Tim Jenkins, Licensed Clinical Professional Counsellor (LCPC), which stated that Plaintiff suffers from "social phobia" and explained that confronting her in a public fashion or pressuring her to be involved in social situations would exacerbate her symptoms. (R. at 670).

At Plaintiff's hearing before the ALJ on August 8, 2014, Plaintiff testified that she had fallen on the job on February 4, 2011, but continued to work until January 12, 2012. (R. at 33–34).

---

[8] Plaintiff's height was recorded as 5'0". (R. at 615).

Plaintiff testified that prior to her fall she was employed as a shipping clerk where her job duties included packing boxes which weighed up to 50 pounds and loading them onto trucks. (R. at 43–44). After her accident, her employer tried to accommodate her at a desk job where she answered the door and filed records, but she was unable to perform her duties due to dyslexia, which caused her to "transpose number backwards." (*Id.* at 42–43). She explained that the work was also difficult because it required her to sit for long periods of time at her desk. (*Id.* at 45). She left her job after she fainted on the keyboard. (*Id.* at 45).

Plaintiff testified that she gets severe headaches that sometimes cause her to stammer. (R. at 47). In terms of her mental health, she has experienced long-term anxiety which she used to control with medication and psychological techniques. (*Id.*). She explained that her anxiety is much worse in "pressurized situations" like the fast-paced environment of her former job. (*Id.*).

Plaintiff testified that she is able to wash dishes, do her own laundry, and drive herself to the grocery store and library (which are within a mile and a half of her residence). (R. at 36–37). She uses a cellphone to text her children about her doctor's appointments and other errands. (*Id.* at 39–40). She explained that she had visited a friend in Florida in hopes that she could find someone to live with, but due to the amount of driving required in Florida, she returned home. (*Id.* at 40–41).

The ME testified at Plaintiff's administrative hearing via teleconference. (R. at 58–66). After reviewing Plaintiff's record and listening to her testimony, Dr. Ezike stated that Plaintiff suffers from the medically determinable impairments of cervi-

cal degenerative disc disease, status post-fusion surgery, left shoulder degenerative changes, diabetes, hypertension, and obesity, but that none of her impairments, singularly or in combination, equals a listing. (*Id.* at 61–62, 65). He opined that Plaintiff retains the functional capacity to perform sedentary work, even in light of her obesity, but that she would be limited to occasional reaching on her left side in all directions, including overhead; she should avoid exposure to extreme temperatures; she could never climb ropes, ladders, or scaffolds; and she could frequently handle, finger, and feel with her left side. (*Id.* at 62–63).

The ALJ also heard testimony from the VE. (R. at 67–76). The ALJ asked the VE to consider whether a hypothetical individual with Plaintiff's same age, education, and work experience who was further limited to sedentary work and could occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl; could occasionally reach in all directions, including overhead, with the left upper extremity; could frequently handle, finger, and feel with the left upper extremity; must avoid exposure to and work around extreme cold and heat, and hazards such as moving machinery and unprotected heights; and could perform unskilled work tasks that could be learned by demonstration in thirty days or less that were simple, repetitive, and routine in nature, could perform Plaintiff's past relevant work. (*Id.* at 68). The VE answered negatively, but responded that the individual could perform other work as a circuit board assembler (1,800 jobs regionally), address clerk (1,000 jobs regionally), and document preparer (1,200 jobs regionally). (*Id.* at 68–69). The VE explained that the jobs

would remain available, without erosion, even if the individual described in the ALJ's first hypothetical was additionally limited to work involving occasional contact with the general public of a superficial, incidental nature; occasional interaction with supervisors and coworkers; occasional decision making; and occasional work setting changes, with no fast-paced work or strict production quotas, but still meet end of the day production goals. (*Id.* at 69).

On cross-examination by Plaintiff's counsel, the VE explained that in order to provide an estimate of the available number of jobs, she applied her own professional experience to the employment numbers listed in "various government resources" including the Dictionary of Occupational Titles (DOT), census information, and the Bureau of Labor Statistics. (R. at 66–76).

## V. DISCUSSION

Plaintiff raises five arguments in support of her request for reversal: (1) the ALJ's subjective symptom evaluation was patently wrong; (2) the ALJ's RFC assessment was erroneous; (3) the ALJ's step two determination was not supported by substantial evidence; (4) the ALJ's step three discussion was perfunctory; and (5) the ALJ relied at step five on the faulty testimony of the VE.

## A. The ALJ's Subjective Symptom Evaluation Is Not Patently Wrong

First, Plaintiff challenges the ALJ's evaluation of her subjective symptoms. The Social Security Administration determined recently that it would no longer assess the "credibility" of a claimant's statements, but would instead focus on determining the "intensity and persistence of [the claimant's] symptoms." SSR 16-3p, at *2. "The

change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original).

The regulations describe a two-step process for evaluating a claimant's own description of his or her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2; *see also* 20 C.F.R. § 416.929. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . ." SSR 16-3p, at *2.

In evaluating the claimant's subjective symptoms, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 16-3p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve

[the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's subjective symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support the claimant's subjective symptoms. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 16-3p, like former 96-7p, requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted).

The Court will uphold an ALJ's subjective symptom evaluation if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons" for the subjective symptom evaluation; "the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted). "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Id.*

Plaintiff alleges disability based on symptoms related to degenerative disc disease. (R. at 299). She asserts that she is unable to sit, stand, walk, or perform any physical activities for prolonged periods of time because of pain, fatigue, and weakness. (*Id.*). She also finds it difficult to lift, carry, push, pull, reach, turn, bend,

squat, or kneel. (*Id.*). Her pain disrupts her concentration, and she needs frequent rest breaks and naps throughout the day. (*Id.*). She is easily frustrated and has poor memory. (*Id.*).

Plaintiff argues that the ALJ used "boilerplate" language as an explanation for her subjective symptom evaluation. (Dkt. 17 at 13). In her decision, the ALJ stated in part:

> After careful consideration of the evidence, I find that [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for reasons explained in this decision.

(R. at 17). This is the same language that the Seventh Circuit has repeatedly described as "meaningless boilerplate" because it "yields no clue to what weight the [ALJ] gave the testimony" and fails to link the conclusory statements made with the objective evidence in the record. *Bjornson v. Astrue,* 671 F.3d 640, 645 (7th Cir. 2012). "However, the simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his [subjective symptom evaluation]." *Pepper v. Colvin,* 712 F.3d 351, 367–68 (7th Cir. 2013). The ALJ did that here.

In her decision, the ALJ also stated:

> [Plaintiff's] allegations regarding the nature of her symptoms and impairments are not fully supported by the medical evidence of record. The record indicates degenerative disc disease in [Plaintiff]s cervical and lumbar spine. [Plaintiff] showed improvement with surgery to her C5-C6, physical therapy and epidural steroid injections. While she continued to complain of pain and numbness in her left upper extremity, the record lacks evidence of treatment with pain medication or anti-inflammatory medication. In fact, [Plaintiff] refused opioid medication

during treatment, Further the record shows sporadic treatment in 2013 and 2014. Combined with her activities of daily living, which include chores, cooking and shopping in stores, the record supports the residual functional capacity assessment stated above. With regard to [Plaintiff's] mental health treatment, although the record contains minimal evidence of mental health treatment, [Plaintiff] has been given the benefit of the doubt in the mental portion of the residual functional capacity.

(R. at 21). These statements allow the Court to sufficiently analyze what the ALJ relied on when she discounted Plaintiff's subjective symptoms. *See Pepper,* 712 F.3d at 368–69. The ALJ also summarized several of Plaintiff's treatment records which revealed that her disc disease had improved with surgery and epidural injections. (R. at 16–21). Next, the ALJ noted that despite Plaintiff's testimony that her anxiety disrupted her concentration, none of the state agency consultants who reviewed Plaintiff's file opined that her mental impairments would result in a severe limitation. (*Id.*). Finally, the ALJ found that Plaintiff's activities of daily living, including her ability to cook, clean, and grocery shop, supported a finding that she was capable of sedentary work. (*Id.* at 21).

While Plaintiff contends that the "record is *replete* with 'objective findings' that support [her] symptoms" (Dkt. 17 at 13) (emphasis added), she cites to only two records, both of which the ALJ addressed (R. at 18). In January 2013, Plaintiff complained to Dr. Giricz of pain in her neck that radiated into her left shoulder and arm. (R. at 585). However, Plaintiff refused narcotic pain medication, indicating that she could cope with the pain through other methods. (*Id.*). Dr. Giricz merely continued Plaintiff's Xanax (alprazolam) for her anxiety and Klonopin (clonazepam) for her social phobia. (*Id.* at 586). The ALJ also considered and rejected Dr. Payne's

opinion that Plaintiff has disabling pain, finding the opinion contrary to Dr. Payne's own objective clinical and laboratory findings. (*Id.* at 19–20). Indeed, Plaintiff does not contest the ALJ's conclusion that Dr. Payne's opinions are due "very little weight." (*Id.* at 20). In any event, the ALJ acknowledged that Plaintiff "continued to report pain" (*id.* at 18) and limited her RFC accordingly (*id.* at 16) (limiting Plaintiff to simple, repetitive, routine tasks).

Plaintiff also asserts that the ALJ's subjective symptom evaluation "fails to specify which of Plaintiff's statements she finds incredible." (Dkt. 17 at 14). To the contrary, the ALJ specifically found Plaintiff's allegations that she was "unable to sit, stand, walk, or perform any physical activity for prolonged periods of time due to pain, fatigue and weakness" (R. at 17) was contradicted by the lack of "treatment with pain medication or anti-inflammatory medicine" and Plaintiff's "activities of daily living, which include chores, cooking and shopping in stores" (*id.* at 21).

Under these circumstances, the Court cannot conclude that the ALJ's subjective symptom evaluation was patently wrong. The ALJ supported her decision with specific findings, supported by substantial evidence. *Moss*, 555 F.3d at 561.[9]

---

[9] Plaintiff also argues that the ALJ's subjective symptom evaluation is patently wrong because she failed to discuss all of the available evidence. (Dkt. 17 at 14). The Court need not review this argument, as it is well-settled that ALJs have never been required to "address every piece of evidence or testimony in the record." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001); *see also Villano*, 556 F.3d at 562 ("The ALJ is not required to discuss every piece of evidence, but must build a logical bridge from evidence to conclusion.").

## B. The ALJ's RFC Determination Accounted for All of Plaintiff's Medically Determinable Impairments

Plaintiff argues that the ALJ failed to factor her mental impairments (anxiety and depression), morbid obesity, social phobia, and the side effects of her medication into her RFC computation. (Dkt. 17 at 9–12). "The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; *see* 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."). In determining an individual's RFC, the ALJ must consider all of her limitations which arise from medically determinable impairments, even those that are not severe. SSR 96-8p; *Villano*, 556 F.3d at 563. The RFC is based upon medical evidence as well as other evidence, such as testimony by the claimant or her friends and family. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). In assessing a claimant's RFC, the ALJ may not dismiss evidence contrary to the ALJ's determination. *Id.*; *Villano*, 556 F.3d at 563; *see* 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96–8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

As an initial matter, the Court can easily dispense with Plaintiff's claims regarding her social phobia, the side effects of her medications, and her mental limitations. Plaintiff's "social phobia" is documented only once in the record in an undated letter from Tim Jenkins, LCPC. (R. at 670). But as the ALJ properly noted, the

Commissioner requires evidence from an acceptable medical source to establish whether a claimant has an impairment, and a LCPC is not an acceptable medical source. (*Id.* at 20); *see* 20 C.F.R. § 404.1513(a). Further, Plaintiff has not identified any medical evidence supporting her social phobia. *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) ("The claimant bears the burden of submitting medical evidence establishing her impairments and her residual functional capacity.") (citing 20 C.F.R. §§ 404.1512(a), (c), 404.1513(a), (b), 404.1545(a)(3)); *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) ("a claimant has the burden to prove disability"). In any event, the ALJ limited Plaintiff to only occasional contact with the general public and only occasional interaction with supervisors and co-workers. (R. at 16).

Similarly, Plaintiff does not explain what side effects she experiences from her medications or how they would affect her ability to work. (*See* Dkt. 17 at 10–11). In his June 2013 assessment, Dr. Payne opined that "pain and/or side effects of medication" only slightly interfere with Plaintiff's ability to perform tasks requiring sustained attention and concentration. (R. at 625). But even if Dr. Payne was referring to side effects—and not merely pain—the ALJ gave Dr. Payne's opinion little weight because it was not supported by his own objective findings, a finding that Plaintiff does not contest. Further, the ALJ limited Plaintiff to "unskilled work tasks that can be learned by demonstration in 30 days or less of a simple, repetitive and routine nature." (*Id.* at 16). Therefore, the ALJ sufficiently incorporated any alleged side effects of Plaintiff's medication into the RFC assessment.

Plaintiff's assertion that the ALJ failed to account for her anxiety and depression is also without merit. (Dkt. 17 at 10). The ALJ determined at step two that Plaintiff's depression and anxiety cause no more than "mild" limitations in activities of daily living, social functioning, and in concentration, persistence or pace and categorized her mental impairments as nonsevere. (R. at 15). Nevertheless, the ALJ gave Plaintiff "the benefit of the doubt" in the mental portion of her RFC (*id.* at 21), limiting Plaintiff to unskilled work tasks which could be learned by demonstration in 30 days or less, and which were of a simple, repetitive, and routine nature (*id.* at 16). Plaintiff does not identify any medical evidence indicating that any further limitations are warranted. *Punzio*, 630 F.3d at 712. Thus, contrary to Plaintiff's assertions, the ALJ provided a sufficient assessment of Plaintiff's mental impairments and properly incorporated those assessments into her RFC determination.[10]

---

[10] Plaintiff also argues that the ALJ erred at step two by failing to conclude that her anxiety and depression were severe impairments. (Dkt 17 at 6–8). But a finding at step two of at least one severe medical condition "is merely a threshold requirement." *Hickman v. Apfel,* 187 F.3d 683, 688 (7th Cir. 1999). Upon finding one severe condition, the ALJ must "consider the aggregate effect of this entire constellation of ailments—including those impairments that in isolation are not severe." *Golembiewski v. Barnhart,* 322 F.3d 912, 918 (7th Cir.2003). Thus, the ALJ's failure to identify more than one severe impairment at step two does not constitute reversible error. *See, e.g., Cole v. Astrue,* No. 09 C 2895, 2011 WL 3468822, at *5–6 (N.D. Ill. Aug. 8, 2011); *Boucek v. Astrue,* No. 08 C 5152, 2010 WL 2491362, at *14–15 (N.D. Ill. June 16, 2010) ("where ALJ finds claimant suffers from severe impairments, failure to find other condition constituted a severe impairment could not constitute reversible error") (citation omitted). And, as discussed above, Plaintiff has failed to demonstrate how her medically determinable mental impairments of depression and anxiety were not accounted for in the ALJ's RFC determination, which limited Plaintiff to unskilled work that (1) could be learned by demonstration or in 30 days or less; (2) was simple, repetitive, and routine; (3) involved only occasional decision making, changes in work setting, contact with the public, and interaction with supervisors and co-workers; (4) and had no strict production quotas or fast pace.

Finally, Plaintiff contends that the ALJ failed to take into account the impact of her "morbid obesity" on her ability to work. (Dkt. 17 at 10, 12). The ALJ found that Plaintiff's obesity was a severe impairment and acknowledged her weight and body mass index throughout the decision. (R. at 14, 17–18). The ALJ considered the entire, longitudinal record, which included Plaintiff's obesity, when determining her RFC. (*Id.* at 16–21); *see Sienkiewicz v. Barnhart*, 409 F.3d 798, 802–03 (7th Cir. 2005) (ALJ found claimant was obese and nothing suggests that he then disregarded that finding when evaluating her RFC). Plaintiff appears to confuse conditions with disabilities. "A person can be depressed, anxious, and obese yet still perform full-time work." *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005). As the Seventh Circuit explained:

> Conditions must not be confused with disabilities. The social security disability benefits program is not concerned with health as such, but rather with ability to engage in full-time gainful employment. A person can be depressed, anxious, and obese yet still perform full-time work. This point is obscured by the tendency in some cases to describe obesity as an impairment, limitation, or disability. It is none of these things from the standpoint of the disability program. It can be the *cause* of a disability, but once its causal efficacy is determined, it drops out of the picture. If the claimant for social security disability benefits is so obese as to be unable to bend, the issue is the effect of that inability on the claimant's capacity for work.

*Id.* (citation omitted) (emphasis in original). Plaintiff fails to demonstrate how her obesity combined with her other impairments impacts her ability to work. *Hisle v. Astrue*, 258 F. App'x 33, 37 (7th Cir. 2007) (claimant bears the burden to "articulate how her obesity limits her functioning and exacerbates her impairments"); *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006) (claimant must "specify how his

obesity further impaired his ability to work") (citation omitted); *see also Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("Skarbek does not explain how his obesity would have affected the ALJ's five-step analysis.").

Further, in assessing Plaintiff's RFC, the ALJ gave great weight to the opinion of the ME who testified that he had considered Plaintiff's obesity, as well as her other impairments, and determined that she was capable of performing sedentary work. (R. at 20, 62–63); *Prochaska*, 454 F.3d at 736–37 (ALJ's "failure to explicitly consider the effects of obesity [is] harmless error" where the ALJ adopts "the limitations suggested by the specialists and reviewing doctors who were aware of the condition"); *Skarbek*, 390 F.3d at 504 (holding that an ALJ's failure to explicitly discuss a plaintiff's obesity resulted in harmless error when the ALJ "adopted the limitations suggested by the specialists and reviewing doctors, who were aware of [the claimant's] obesity."). The ALJ adopted the limitations suggested by the ME including, *inter alia*, sedentary work, only occasional reaching in all directions with her left upper extremity, and never climbing ropes, ladders, and scaffolds. As a result, Plaintiff's obesity was indirectly factored into her RFC assessment. *Skarbek*, 390 F.3d at 504 (where the claimant "does not specify how his obesity further impaired his ability to work [and] . . . the ALJ adopted the limitations suggested by the specialists and reviewing doctors, who were aware of [the claimant's] obesity, . . . [the obesity] was factored indirectly into the ALJ's decision as part of the doctors' opinions").

Plaintiff additionally contends that the ALJ "cherry picked" medical records to support her RFC determination. (Dkt. 17 at 11–12). In particular, Plaintiff's takes issue with the ALJ's treatment of Dr. Giricz's January 2013 record where he reported that Plaintiff's blood sugars had worsened due to her diet over the holidays, she no longer wished to take narcotics due to health concerns, and she continued to have pain in her thoracic spine. (*See* R. at 607). But the ALJ did acknowledge that Plaintiff had not been compliant with her diet in January 2013 and summarized her weight three months later. (*Id.* at 18). And the ALJ noted that despite Plaintiff refusing to take narcotic pain relievers, other treatment, like injections and physical therapy, had alleviated Plaintiff's pain. (*Id.*); *see Worzalla v. Barnhart*, 311 F. Supp. 2d 782, 788 (E.D. Wis. 2004) ("it is the ALJ who has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact and determine the case accordingly") (citing *Richardson v. Perales*, 402 U.S. 389, 399–400 (1971)); *Skarbek*, 390 F.3d at 503 ("When reviewing the record, this court may not re-weigh the evidence or substitute its judgment for that of the ALJ."). In any event, Plaintiff does not explain how the RFC assessment—limiting her to sedentary, unskilled work of a simple, repetitive and routine nature—was inconsistent with this single treatment note. *Punzio*, 630 F.3d at 712 ("The claimant bears the burden of submitting medical evidence establishing her impairments and her residual functional capacity.").

## C. The ALJ's Step Three Analysis is Supported by Substantial Evidence

At step three, the ALJ determined that during the relevant time period, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listings enumerated in the regulations. (R. at 16). Specifically, the ALJ concluded:

> I find no evidence of listing level impairment with consideration given to listings 1.02 and 1.04, or any other listened [*sic*] impairment . . . . Even with consideration given to obesity, [Plaintiff] does not manifest clinical signs and findings that meet the specified criteria of any listing. In reaching his conclusion, I considered the opinions of the State Agency Medical consultants and the impartial medical expert who testified at the hearing.

(*Id.*). Plaintiff challenges the validity of the ALJ's determination, arguing that the ALJ's determination was perfunctory and failed to refer to any record support whatsoever. (Dkt. 17 at 8–9). The Court disagrees.

Although the ALJ's step three determination was limited to a single paragraph, the ALJ provided a discussion of Plaintiff's severe and nonsevere impairments, the objective medical evidence, and Plaintiff's subjective symptoms directly after step three when the ALJ determined Plaintiff's RFC. (R. at 16–21). The ALJ also gave substantial weight to the opinion of the ME who, after reviewing the medical file, concluded that Plaintiff's impairments fail to meet any of the Listings. (*Id.* at 16, 20, 61–62, 65). "This discussion provides the necessary detail to review the ALJ's step 3 determination in a meaningful way. We do not discount it simply because it appears elsewhere in the decision. To require the ALJ to repeat such a discussion through-

out his decision would be redundant." *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015).

Plaintiff has failed to meet her burden to demonstrate that her impairments satisfy all the requirements of Listing 1.04(A) or (B). *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (The claimant "has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing."); *Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009) (The "claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a listing."). The medical evidence supports the ALJ's determination. Listing 1.04, *Disorders of the Spine*, requires the inability to ambulate effectively. 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04. The regulations define "inability to ambulate effectively" as "an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* § 1.00(B)(2)(b)(1). Thus, ineffective ambulation means "having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.* (citation omitted). But Plaintiff has not demonstrated an inability to ambulate effectively as contemplated by the regulations. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00(J)(4) ("The medical basis for the use of any assistive device (e.g., instability, weakness) should be documented."). Indeed, the medical evidence cited by the ALJ indicates otherwise. (R. at 16–21).

Plaintiff contends that the ALJ ignored Dr. Payne's report that revealed "spondylolisthesis at L4-L5 with myofascial pain syndrome which has also caused pseudoclaudication in the lower back, buttocks, and lower extremities." (Dkt. 17 at 9). In fact, the ALJ noted that this "imaging of [Plaintiff's] cervical spine showed degenerative changes and subluxation at the L4-L5 level." (R. at 18). And this evidence alone is not sufficient to prove that Plaintiff met or medically equaled Listing 1.04. The ALJ's step three determination is supported by substantial evidence.

## D. Step Five

Plaintiff contends that the ALJ's step-five determination was faulty. (Dkt. 17 at 14–15). Plaintiff argues that the ALJ's hypothetical question to the VE failed to include "all of the limitations supported by the medical record." (*Id.* at 14). This contention merely regurgitates Plaintiff's subjective symptom and RFC arguments, which the Court has addressed. As discussed above, the ALJ fully employed the appropriate medical evidence and Plaintiff's credible testimony in formulating Plaintiff's RFC. In posing hypothetical questions to the VE, the ALJ included all these credible limitations. *Indoranto*, 374 F.3d at 474 ("the hypothetical question he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record")

Plaintiff also contends that the VE's testimony was unreliable because she was unable to produce the "source for the job numbers about which she testified . . . on demand." (Dkt. 17 at 15). Her argument is unpersuasive. At the administrative hearing, the VE testified that her assessment was based on several resources such

as the DOT, census information, the Bureau of Labor Statistics, and her own pro-fessional experience. The DOT, Census Reports, and the Occupational Outlook Handbook published by the Bureau of Labor Statistics are all governmental publi-cations of which the ALJ was required to take administrative notice. *See* 20 C.F.R. § 404.1566(d). Therefore, the ALJ reasonably relied on the VE's testimony when she determined that Plaintiff could perform a significant number of jobs available in the national and local economy. *See Jones v. Colvin*, No. 09 C 7645, 2013 WL 1407779, at *17 (N.D. Ill. Apr. 8, 2013) (finding no error with the ALJ's failure to produce ev-idence supporting number of jobs because VE appropriately relied on DOT, state la-bor statistics, and experience); *Kastner v. Astrue*, No. 09 CV 0186, 2010 WL 4860274, at *11 (S.D. Ind. Nov. 22, 2010), *rev'd on other grounds*, 697 F.3d 642 (7th Cir. 2012) (finding no error with ALJ's reliance on VE testimony regarding number of jobs because VE appropriately relied on Employment Statistics Quarterly num-bers).

# VI. CONCLUSION

For the reason's stated above, Plaintiff's Motion for Summary Judgment [16] is **DENIED** and Defendant's Motion for Summary Judgment [22] is **GRANTED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision is affirmed.

E N T E R:

Dated: May 26, 2017

_____
MARY M. ROWLAND
United States Magistrate Judge